*Formatted for Electronic Distribution*                                    *Not for Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

———————————————

In re:
     **Gregory Ladieu,**
          **Debtor**

———————————————

**Rentrak Corporation,**
       **Plaintiff,**
     **v.**

**Gregory Ladieu,**
       **Defendant.**

———————————————

**Chapter 7 Case
# 07-10868**

Filed & Entered
On Docket
February 24, 2011

**Adversary Proceeding
# 08-1010**

*Appearances*:  W. Scott Fewell, Esq.            *David W. Lynch, Esq.*
                *Burlington, VT 05402*         *Colchester, VT 05446*
                *Attorney for Plaintiff*          *Attorney for Defendant*

### MEMORANDUM OF DECISION
### ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

On June 2, 2008, Plaintiff, Rentrak Corporation ("Rentrak") filed a two-count complaint against the Defendant-Debtor, Gregory Ladieu ("Ladieu") seeking a declaration that the amounts Ladieu owes to Rentrak under the agreement between Rentrak and Ladieu's company, Galadieu Enterprises LLC ("Galadieu"), are non-dischargeable under §§ 523(a)(4) and (a)(6) of the Bankruptcy Code (the "Code").[1]  Ladieu filed an answer (doc. # 5), which contained affirmative defenses (unclean hands and failure to state a claim) and a counterclaim for attorney's fees and costs.

In its motion for summary judgment (doc. # 35), Rentrak seeks a judgment on its claims that Ladieu's obligations to Rentrak are nondischargeable under §§ 523(a)(4) and 523(a)(6).  Ladieu has filed opposition to the motion for summary judgment and a cross-motion for summary judgment (doc. # 36).  Ladieu's opposition requests that the Court deny Rentrak's motion because Ladieu did not owe Rentrak a fiduciary duty, and there are disputes regarding material facts determinative of whether Ladieu willfully or maliciously converted Rentrak's property.  At a hearing on January 5, 2010, the Court granted Ladieu's motion to reopen summary judgment pleadings (doc. # 50)  to allow Ladieu to brief new legal issues in light of the Court's ruling in <u>Nanak Resorts, Inc. v. Haskins Gas Service, Inc.</u> (<u>In re Rome Family Corp.</u>), 407 B.R. 65 (Bankr. D. Vt. 2009) (hereafter the "<u>Rome</u> decision").  Both

---

[1] All references to provisions of the Bankruptcy Code (Title 11, United States Code) will be preceded by a "§" symbol.
References to sections of the Uniform Commercial Code (the "UCC") will be preceded by "UCC §."

parties filed briefs. (docs. ## 57, 58, 60, 62).  In his brief, Ladieu asserts as another point of opposition
to the Rentrak's motion that the agreement entered into between the parties is not a lease, but rather is a
disguised security agreement (doc. #57).

 Ladieu's cross-motion for summary judgment (doc. # 36) seeks a ruling that in the event the
Court grants Rentrak summary judgment on the issue of liability, no damages are due because the
damages Rentrak seeks, in the amount of $46,547.28, are unreasonable and unenforceable.  His rationale
for this position is: (1) the damages are not conclusively established by Rentrak's judgment from
Oregon state court (the "Oregon Judgment") against Galadieu; (2) the damages are not properly set by
the damages provision relied upon by Rentrak, ¶ 8.2.3 of their agreement; and (3) a portion of the fees
Rentrak seeks are clearly outside the scope of § 523 as they arise from an ordinary breach of contract
claim.

 For the reasons set forth below, the Court finds there are material facts in dispute and therefore
denies Rentrak's summary judgment motion seeking judgment as a matter of law against Ladieu under
§§ 523(a)(4) and  523(a)(6), and the Court denies summary judgment on Ladieu's motion for a
determination that the amount of damages Rentrak seeks is unreasonable and unenforceable.

### ISSUES PRESENTED

 These cross-motions for summary judgment present four issues: First, is it Oregon or Vermont
law that determines the outcome of the legal issues before the Court? Second, is the parties' agreement a
disguised security agreement or a true lease? Third, does Ladieu owe a fiduciary duty to Rentrak?
Fourth, does the parties' agreement include a valid liquidation damages provision that establishes
Rentrak's right to the damages it asserts?

### JURISDICTION

 This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and
157(b)(2)(B) and (I).

### UNDISPUTED MATERIAL FACTS

 Under local rule 7056-1(3), "[a]ll material facts in the movant's statement of undisputed facts are
deemed admitted except to the extent controverted by a statement of disputed material facts filed by the
opposing party." Vt. LBR 7056-1(3).  The Court finds the following facts to be material as to the issues
raised in the parties' cross-motions for summary judgment and to be undisputed based upon the record:

 1.  Ladieu formed Galadieu and was its sole member.  Plaintiff's Statement of Undisputed Material
Facts (hereafter "PSUMF") ¶ 1 (doc. # 35-2).

 2.  Galadieu purchased a Showtime Video and Big Scoop Ice Cream Shop ("Showtime Video") in
May of 2005; that business was located in Swanton, Vermont.  PSUMF ¶ 2.

3.  Galadieu was formed solely for the purpose of acquiring Showtime Video.  PSUMF ¶ 3.

4.  Showtime Video, among other things, was in the business of renting and/or selling pre-recorded video cassettes and digital video discs.  PSUMF ¶ 4.

5.  On May 31, 2005, Rentrak and Galadieu d/b/a Showtime Video entered into a general pay-per-transaction agreement (the "PPT Agreement").  PSUMF ¶ 5; Ex. B in the App. of Exs. to Rentrak's Mot. (doc. # 35-3).

6.  Rentrak and Galadieu also entered into studio addenda with Lions Gate (5/31/05), Fox (5/31/05), Sony (11/17/05), and Paramount (9/2005) (the "Studio Addenda") (collectively the PPT Agreement and the Studio Addenda are referred to as the "Agreement").  PSUMF ¶ 5; Ex. B in the App. of Exs. to Rentrak's Mot. (doc. # 35-3) (consisting of the PPT Agreement and each Studio Addenda).

7.  Ladieu signed the PPT Agreement on behalf of Galadieu. PSUMF ¶ 5; Exhibit B in the Appendix of Exhibits to Rentrak's Mot. (doc. # 35-3); Ex. B in the App. of Exs. to Rentrak's motion (doc. # 35-3).

8.  Ladieu also executed a personal guarantee of Galadieu's obligations under the PPT Agreement. PSUMF ¶ 6; Ex. B in the App. of Exs. to Rentrak's Mot. (doc. # 35-3).

9.  Pursuant to the Agreement, Rentrak leased pre-recorded video cassettes and digital video discs ("Cassettes") to Galadieu based on a revenue sharing arrangement for Galadieu's retail customers to rent and/or purchase.  PSUMF ¶ 7.

10. The PPT Agreement contained general terms and obligations, and the Studio Addenda contained additional lease terms, with the revenue sharing percentages for Cassettes established on a title-by-title basis by the reproducing studio(s). PSUMF ¶ ¶ 5 and 7; Ex. B in the App. of Exs. to Rentrak's Mot. (doc. # 35-3).

11. The Agreement required Galadieu to remit monies/fees to Rentrak generated by Galadieu's rental and sale of Cassettes.  Galadieu's remittal obligations included, but were not limited to, a minimum monthly fee, a minimum transaction fee and/or a percentage of the revenue obtained from rental of the Cassettes, a percentage of collected late fees; and a fee for the purchase of Cassettes or a percentage of revenue received from the sale of Cassettes. PSUMF ¶ 9; Ex. B in the App. of Exs. to Rentrak's Mot. (doc. # 35-3).

12. Under the terms of the PPT Agreement, Galadieu was required to do, or be subject to, the following:

        a.  utilize a compatible point-of-sale ("POS") computer system to record all video rental and sale transactions, at the time of the rental or sale transaction occurred, and to

electronically report accurate and complete information of the rental or the sale to Rentrak (1.1.1 & 1.1.5);

b. enter all Cassettes into the POS computer upon receipt and make them available for rental within one day of receipt (1.1.6);

c. prohibit the removal of Cassettes from Galadieu's rental inventory and prohibit the purchase  of rental inventory prior to the end of the title's lease term (2.2);

d. make available at least one copy for rental during each title's lease term (2.4);

e. prohibit the sale of any Cassettes prior to the published sale date (2.3);

f. return all Cassettes not sold as permitted under the Agreement or already returned to [Rentrak], or, if permitted to, kept, and to return all returned Cassettes in good condition, normal wear and tear accepted, and in their original packaging (2.4);

g. be responsible for general lease terms including "Order Processing Fee," "Transaction Fee," "Sell-Through Fee," and "Buy-Out Fee" all of which were set by the Studio Addenda, and monthly "Access/User Fee" and "Processing Fee" set by the PPT Agreement (5.1-5.2);

h. fulfill its fiduciary duty, i.e., hold in trust, and remit to Rentrak, Rentrak's portion of the rental and sale proceeds, and report to Rentrak in accordance with the Agreement (9.6); and

i. as to termination

   i. the PPT Agreement would terminate "after (i) all Galadieu's obligations under the PPT Agreement were satisfied, and (ii) ninety (90) days after the last day of the last lease term of any Cassettes ordered under the Studio Addenda" (7.1) ;

   ii. Galadieu was required to deliver to Rentrak, within fifteen (15) days after the lease's termination, all Cassettes not validly purchased or otherwise properly disposed as provided by the Agreement, and return the Cassettes in good condition (normal wear and tear excepted) and to ship them in their original packaging,with all shipping and postage prepaid (7.2).

Ex. B in the App. of Exs. to Rentrak's Mot. (doc. # 35-3).

13. The Studio Addenda all set forth general terms regarding ordering obligations, articulated the fee schedules applicable to Cassettes ordered from each specific studio covering the above-referenced fees, and provided that in the event of termination of any individual studio addenda all of Galadieu's obligations under the PPT Agreement remained in full effect.  Ex. B in the App. of Exs. to Rentrak's Mot. (doc. # 35-3).

14. In early October 2007, Rentrak became aware that Ladieu was having financial difficulties. PSUMF ¶ 15.

15. Sometime in November 2007, Ladieu decided to close the store and notified Rentrak of his decision. PSUMF ¶ 17; Affidavit of Gregory Ladieu ¶ 1 (Ex. A to Ladieu's Opp'n. to Rentrak's Mot. and Cross-Mot. For Summ. J. (doc # 36-1)).

16. On November 1, 2007, Rentrak sent a letter to Ladieu advising him that the Galadieu account was delinquent.  PSUMF ¶ 16.

17. As of November 7, 2007, Rentrak's records showed that Galadieu had 899 Rentrak Cassettes in its possession. PSUMF ¶ 20.

18. On November 8, 2007, Rentrak sent a Notice of Default and Intent to Enforce Letter advising him again that the Galadieu account was in default.  PSUMF ¶ 22.

19. On November 12, 2007, Rentrak confirmed with Ladieu's landlord that the store would be closing.  PSUMF ¶ 23.

20. On November 19, 2007, Rentrak contacted Ladieu to demand payment for past due invoices, and Ladieu informed Rentrak that he did not intend to pay, had retained an attorney, and intended to file a Chapter 7 bankruptcy case.  PSUMF ¶ 24.

21. On November 21, 2007, Rentrak terminated Galadieu's account.  PSUMF ¶ 26.

22. At the time of Rentrak's termination of the Agreement, Galadieu's inventory included a total of 2,865 cassettes, of which 899 were under the Agreement with Rentrak.  PSUMF ¶¶ 19 and 20.

23. On November 27, 2007, Rentrak sent a notice of default and contract termination and demand for return of property.  The notice provided a list of inventory of Cassettes in Galadieu's possession, and instructed Galadieu to return the inventory in their original boxes within 15 days, and stated that any product not returned in the original boxes would not be credited to Galadieu's account.  PSUMF ¶ 31.

24. Ladieu received the November 27 notice of default letter.  PSUMF ¶ 37.

25. In late November and early December 2007, Galadieu began selling its Cassettes on a cash only basis.  PSUMF ¶¶ 34-36.

26. In late November or early December 2007, Ladieu created a generic "movie" account in Galadieu's computer system under which he entered sale of all inventory, including the Cassettes. PSUMF ¶ 29; Aff. of Gregory Ladieu #2 ¶ 6 (doc. # 42-1).

27. Galadieu had at least on copy of each of the Cassettes listed in the list of inventory at the time Ladieu received the November 27, 2007 letter from Rentrak.  PSUMF ¶ 33.

5

28. Galadieu initiated a "blow out sale" after receiving Rentrak's November 27th letter, and from that time until December 10, 2007, Galadieu sold the Cassettes initially for $5, then for $3, and finally for $1 per cassette. PSUMF ¶¶ 34-36; Aff. of Gregory Ladieu # 2 ¶ 10 (doc. # 42-1)

29. On December 7, 2007, Rentrak initiated an electronic audit of Galadieu's inventory and determined that 899 units were still identified on Galadieu's POS computer as being in active circulation. PSUMF ¶ 38.

30. Ladieu terminated the business on December 10, 2007. PSUMF ¶ 39.

31. Following the blowout sale, Galadieu had approximately 75 cassettes, but it is unknown how many of these were Rentrak Cassettes. PSUMF ¶ 40 (number of cassettes corrected by reference to the cited deposition. See Dep. of Gregory Ladieu, p.79, ln. 2 – p. 80, ln. 11 (doc # 35-3)).

32. Ladieu did not pay Rentrak any portion of the proceeds from the sale or rental of Rentrak Cassettes from October 2007 through the termination of the business on December 10, 2007. PSUMF ¶ 42.

33. In the final days of the sale, when Galadieu only accepted cash, Ladieu kept the cash in a safe and deposited the cash into his wife's personal checking account; he did not deposit any of it in Galadieu's account. PSUMF ¶ 43.

34. The total amount of income Galadieu generated from the sale of the Cassettes during the period of November 7 through December 15, 2007 was between $7,800 and $12,100. Ladieu used this income to pay business and tax obligations; he used none of this income to pay Rentrak. PSUMF ¶ 44-45; Aff. of Gregory Ladieu # 1, ¶ 5 (doc. # 36-1).

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the record shows no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056; see also Bronx Household of Faith v. Bd. of Educ. of the City of New York, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that no genuine issue of material fact exists. See Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). A genuine issue exists only when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The substantive law identifies those facts that are material; only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 248. Factual disputes that are irrelevant or unnecessary are not material. Id. In making its determination, the court's sole function is to determine whether there is any material dispute of fact that requires a trial. Id. at 249; see also

Palmieri v. Lynch, 392 F.3d 73, 82 (2d Cir. 2004).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party.  See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 579 (2d Cir 2006).  If the nonmoving party does not come forward with specific facts to establish an essential element of that party's claim on which it has the burden of proof at trial, the moving party is entitled to summary judgment.  See Celotex Corp., 477 U.S. at 323–25 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case"); see also Tufariello v. Long Island R. Co., 458 F.3d 80, 85 (2d Cir. 2006).

The above standard applies even where the parties file cross-motions for summary judgment, and the Court must consider each motion independently.  WorldCom, Inc. v. General Electric Global Asset Management Services (In re WorldCom, Inc.), 339 B.R. 56 (Bankr. S.D.N.Y. 2006) ("Where, as here, a party has filed a cross-motion for summary judgment, the Court must pay particular attention to the parties' respective burdens of proof, persuasion and production.  When faced with a cross-motion for summary judgment, the Court must consider the merits of each motion independently of the other.").  The Court must examine each motion "on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

DISCUSSION

**A.  THE COURT WILL APPLY OREGON LAW TO DECIDE CONTRACT ISSUES AND VERMONT LAW TO DECIDE TORT ISSUES**

The Court must resolve the issue presented by the choice-of-law provision in the PPT Agreement before addressing the merits of the issues raised in the instant cross-motions.  The choice-of-law provision in the PPT Agreement states:

> This Agreement is and shall be deemed accepted in Oregon and interpreted and enforced in accordance with the laws of the State of Oregon applicable to contracts to be made and to be performed entirely within this state.  The parties hereto agree that any suit, dispute, or action brought pursuant to this Agreement shall be brought exclusively in the Circuit Court of the County of Multomah, State of Oregon, or the Federal Court for the District of Oregon.

PPT Agreement ¶ 9.5.  Not until Ladieu filed his supplemental memo in opposition to Rentrak's motion (doc. # 57) did he argue that the choice-of-law provision should be ignored and Vermont law applied.  Ladieu's argument focuses on the fact that Chittenden Bank, who is not a party to this proceeding, might

7

have a competing security interest in the Cassettes and might argue that the choice-of-law provision in the Agreement is not binding or applicable to a determination of its rights in the Cassettes.  Ladieu relies upon 9A V.S.A. § 9-301 for the proposition that local law governs the perfection of a security interest.

"The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses."  Finance One Pub. Co., Ltd. v. Lehman Brothers Special Fin., Inc., 414 F.3d 325, 332 (2d Cir. 2005).  Thus, the Court looks to Vermont jurisprudence construing choice-of-law provisions.  A separate analysis of choice-of-law principles is necessary for each type of claim, i.e., contract and tort.[2]  The Vermont Supreme Court "has adopted the Restatement (Second) [of Conflicts of Laws][3] for choice-of-law questions in both tort and contract cases."  McKinnon v. F.H. Morgan & Co., Inc., 170 Vt. 422, 423, 750 A.2d 1026, 1028 (Vt 2000).

As to claims based upon contract, in Stamp Tech, Inc. v. Lydall/Thermal Acoustical, Inc., 2009 VT 91, ¶ 23, 186 Vt. 369, 380, 987 A.2d 292, 298-99 (Vt. 2009), the Vermont Supreme Court stated, "[i]n the absence of a statute in the forum state providing otherwise, it is well-settled that it would be contrary to the justified expectations of the parties for a court to interpret their agreement by the law of any jurisdiction other than that specified in the contract." (citing Restatement § 187 cmt. c (1971) (parties may determine the terms of their contractual engagements and spell them out in the contract; in such cases the forum will apply the applicable provisions of the law of the designated state in order to effectuate the intentions of the parties)).

Ladieu's argument against application of Oregon law to resolve contract issues is without merit for three reasons.  First, Chittenden Bank is not a party to this action, and what it might argue if it were seeking a determination as to its rights in collateral against Rentrak is immaterial to a determination of the disputes between Rentrak and Ladieu.  Second, Ladieu himself, in his cross-motion for summary judgment (doc. # 36), stated the Agreement called for the application of Oregon law and cites Oregon statutes and case law in support of his positions.  Further, in his supplemental memorandum of law (doc. # 57), Ladieu concedes that the Vermont and Oregon UCC provisions governing leases are nearly

---

[2] Choice of law is important in this case because in the Agreement's signature section, Ladieu checked the box that identifies Galadieu as a limited liability company, and the law of Oregon is quite different from the law of Vermont on the issue of limited liability company member tort liability.  Under Oregon law, a "member or manager is not personally liable for a debt, obligation or liability of the limited liability company solely by reason of being or acting as a manager."  O.R.S. § 63.165(1); see also Castro-Vega v. Waible, 2007 WL 4885440 *2 (D. Or. Nov. 7, 2007); Benson Apartments, LLC v. Douglas County Assessor, 2005 WL 1804412 *2-3 (Or. T.C. July 27, 2005); but see BLD Prod., LTC v. Technical Plastics of Oregon, LLC, 2006 WL 3628062 *3-4 (D. Or. Dec. 11, 2006) (ruling that a member of an LLC may be liable under a piercing the corporate veil theory).  By contrast, Vermont's nearly identical limited liability company statute contains an exception to the general rule stated in Oregon.  In Vermont, a member or manager is not liable solely by reason of being or acting as a member or manager, "except that such member or manager may become personally liable by reason of his or her own acts or conduct."  11 V.S.A. § 3043(a) (emphasis added).

[3] Further references to this Restatement will be preceded by "Restatement § __."

identical, and then proceeds to cite Oregon statutes and case law. Third, and most importantly, the

parties contracted for Oregon law to apply to the Agreement. Therefore, the Court will enforce the

choice-of-law provision in the Agreement when it adjudicates contracts issues.

As to claims based upon torts, the "general choice-of-law principle for tort cases is that the rights

and liabilities of the parties are determined by the law of the state that 'has the most significant

relationship to the occurrence and the parties under the principles states in § 6.'" McKinnon, 170 Vt. at

424 (citing Restatement § 145(1)). Before looking to Restatement § 6, the first step of the analysis is to

determine "whether a specific section of the Restatement applies to the particular action or issue in

dispute." Id. Here, Rentrak's § 523(a)(4) claim is based upon a defalcation whereas its § 523(a)(6)

claim is based upon conversion. As to the former, the Restatement does not contain a specific section.

However, Restatement § 147 specifically applies to conversion. See Restatement § 147 cmt b.

Restatement § 147 instructs that in an action based upon conversion "the local law of the state where the

injury occurred determines the rights and liabilities of the parties unless, with respect to the particular

issue, some other state has a more significant relationship under the principles stated in Restatement § 6

to the occurrence, the thing and the parties, in which even the local law of the other state will be

applied." Id.

Restatement § 6(2) sets forth:

> broad principles [to be] considered in determining whether one forum's
> contacts are significant enough to override the presumption contained in a
> specific section of the Restatement: (a) the needs of the interstate and
> international systems, (b) the relevant policies of the forum, (c) the
> relevant policies of other interested states and the relative interests of
> those states in the determination of the particular issue, (d) the protection
> of justified expectations, (e) the basic policies underlying the particular
> field of law, (f) certainty, predictability and uniformity of result, and (g)
> ease in the determination and application of the law to be applied.

McKinnon, 170 Vt. at 424-425 (quoting Restatement § 6(2)). "The first three (or perhaps four) of these

general principles carry the greatest weight in the field of tort law." Id. at 425. Restatement § 145(2)

states the "[c]ontacts to be taken into account in applying the [Restatement] § 6 principles in tort cases

are '(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.'" Id. (quoting Restatement §

145 (2)). The contacts are to be evaluated according to their relative importance with respect to the

particular issue. Restatement § 145(2).

Upon review of the principles of Restatement § 6, and specifically the factors of Restatement §

145, the Court concludes Vermont law is the appropriate law to be applied to the tort issues in this

adversary proceeding.  Galadieu operated as a Showtime Video store in Vermont.  Galadieu sold the

Cassettes in Vermont.  Galadieu was a limited liability company under the law of Vermont.

Accordingly, the Court will apply Vermont law to resolve tort issues and Oregon law to resolve

contract issues as they arise in the review of the cross-motions for summary judgment.

**B.   RENTRAK'S § 523(a)(6) CLAIM IS CONTINGENT UPON A DETERMINATION
OF WHETHER THE AGREEMENT IS A "TRUE LEASE."**

Rentrak asserts that Ladieu's conduct constitutes a conversion of the Cassettes, and thus his debt

is excepted from discharge under § 523(6).   Section 523(a)(6) provides in relevant part:

(a)      A discharge under section 727 [and certain other sections of the
Code] does not discharge an individual  debtor from any debt –

* * *

(6) for willful and malicious injury by the debtor to another entity or to
the property of another entity.

§ 523(a)(6).

To prevail under this provision, the plaintiff must prove the acts or conduct of the debtor caused

a willful and malicious injury.  Kawaauhau v. Geiger, 523 U.S. 57, 63, 188 S. Ct. 974, 978 (1998).  The

use of the word willful "indicates 'a deliberate or intentional *injury*, not merely a deliberate or

intentional act that leads to injury.'  The injury caused by the debtor must also be malicious, meaning

'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.'"

Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006) (citations omitted and alteration in original).

"Malice may be constructive or implied . . . Implied malice may be demonstrated 'by the acts and

conduct of the debtor in the context of [the] surrounding circumstances.'"  Navistar Fin. Corp. v. Stelluti

(In re Stelluti), 94 F.3d 84, 88 (2d. Cir. 1996) (citation omitted).

In Vermont, proving the tort of conversion requires that the "owner of property must show only

that another has appropriated the property to that party's own use and beneficial enjoyment, has

exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession

from the owner under a claim of title inconsistent with the owner's title.  Conversion may also be

committed by retention of the property after the owner's rightful demand."  P.F. Jurgs & Co. v. O'Brien,

160 Vt. 294, 299, 629 A.2d 325, 328-29 (Vt. 1993) (citation omitted).  "The key element of conversion,

therefore, is the wrongful exercise of dominion over property of another."  Id. at 299, 629 A.2d 329.  A

party making a claim for conversion "must show an immediate right to possession."  Miller v.

Merchants Bank, 138 Vt. 235, 239, 415 A.2d 196, 199 (Vt. 1980); see also Ag Venture, Fin. Servs, Inc.

v. Montagne (In re Montagne), 413 B.R. 148 (Bankr. D. Vt. 2009).

Ladieu argues Rentrak cannot prevail on its claim for conversion because it cannot show it had an immediate right to possession of the Cassettes. In support of this position, Ladieu argues that if the Court finds the Agreement to be a disguised security agreement, then Chittenden Bank (by virtue of a recorded UCC financing statement) has a claim to the Cassettes that is superior to Rentrak's claim. However, Ladieu concedes that if the Court determines that the Agreement is a true lease, then Chittenden Bank does not have a superior right to the Cassettes (doc. # 57).   As described below, the Court will determine after trial whether the Agreement is a true lease. If the Agreement is a true lease, then the Court will consider the evidence to be presented by Rentrak and determine if Rentrak satisfied the other elements necessary to state a claim  for conversion and obtain relief under § 523(a)(6), including the intent element of § 523(a)(6).

**C.  IS THE RENTRAK AGREEMENT A DISGUISED SECURITY AGREEMENT OR A TRUE LEASE?**

**1.  The Court's <u>Rome</u> decision is only applicable if the Agreement is not a true lease.**

After briefing and a hearing, the Court permitted Ladieu to file a supplemental memo in opposition to plaintiff's motion for summary judgment based upon Ladieu's assertion that the Court's <u>Rome</u> decision was dispositive of the issues to be decided in Plaintiff's motion for summary judgment.

In <u>Nanak Resorts, Inc. v Haskins Gas Service, Inc. (In re Rome Family Corp.)</u>, 407 B.R. 65 (Bankr. D. Vt. 2009), the issue was whether the debtor owned an underground propane tank and related piping (the "System") at the time of the bankruptcy filing and the subsequent § 363 sale of the property above it to the plaintiff, or whether title to the System remained in the defendant pursuant to the terms of its contract with the debtor, despite the sale. The Court found that the Vermont provisions of the UCC applied, specifically 9A VSA § 2-401, which set out the rules for "passing of title." <u>Rome</u>, 407 B.R. at 74. UCC § 2-401(1) states that "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." <u>Id.</u> at 72. Vermont had no case law interpreting UCC § 2-401(1), so the Court turned to cases in other states which had provisions identical to 9A V.S.A. § 2-401(1).[4] <u>Id.</u> at 75. Those cases uniformly held that express agreements concerning passage of title (<u>i.e.</u>, keeping title in the seller after delivery) had to give way to the text of § 2-401(1) which effected transfer of title and allowed the seller no more than the right to reserve a security interest in those goods. <u>Id.</u> The Court adopted that interpretation and ruled that, upon delivery of the System, title shifted to the buyer (the debtor) by operation of law, despite the parties' explicit agreement that title remained with the seller (the defendant) post-delivery. <u>Id.</u> at 78. As a result, since the defendant had not perfected its security interest, the Court found the defendant had no perfected security interest in the System on the date of the sale, the sale included the system, and the

---

[4] The Court notes that the Oregon and Vermont versions of UCC § 2-401 are identical. <u>Compare</u> 9A V.S.A. §2-401 and O.R.S § 72.4010.

Order approving the sale was final. Id. at 78-79. Based upon those findings, the Court granted plaintiff summary judgment on the issue of its ownership of the System. Id. at 79.

Ladieu asserts that UCC § 2-401(1) similarly requires a finding in his favor in this proceeding. However, UCC § 2-401 includes a limitation on its applicability, "[i]n so far as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply . . . ." (emphasis added). UCC § 1-203 "Lease Distinguished from security interest" is one such provision that is germane to the instant dispute. Moreover, Ladieu's own memoranda of law recognize that the Court must first resolve the issue of whether the Agreement is a true lease. If the Agreement is a true lease, Rome is inapplicable.

### 2. The Court must look to Oregon law to decide whether the Agreement is a true lease.

State law determines whether an agreement constitutes a true lease or a security agreement. In re Allen, 174 B.R. 293, 295 (Bankr. D. Or. 1994)(citations omitted). The parties' supplemental briefing correctly relied upon Oregon Revised Statutes 71.2010(37) and 71.2030. The latter is the recodification of the former in a new section named "Lease distinguished from security interest."[5] While the Court found relatively few Oregon cases examining the relevant provisions, as the UCC is a uniform law, the Court may consider decisions from other state and federal courts. See WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt Servs. (In re WorldCom, Inc.), 339 B.R. 56, 63-64 (Bankr. S.D.N.Y. 2006); In re QDS Components, Inc., 292 B.R. 313, 321 n.3 (Bankr. S.D. Ohio 2002). For the sake of clarity, the Court will reference "UCC § 1-203" in its analysis of cases from other jurisdictions as this is name of the relevant section in the uniform version of the statute. We start by observing that the issue of true lease versus installment sales contract has been characterized as "'one of the most vexatious and oft-litigated issues under the Uniform Commercial Code.' As a result, the case law is comprised of 'a disjointed patchwork of decisions that simply cannot be reconciled.'" In re UNI Imaging Holdings, LLC, 423 B.R. 406, 414 (Bankr. N.D.N.Y. 2010) (quoting QDS Components, 292 B.R. at 323, 329).[6]

"An essential characteristic of a lease agreement is that the lessor retains an economically meaningful residual interest in the leased property." QDS Components, 292 B.R. at 331. "[UCC § 1-203] attempts to provide a more rigorous statutory standard to guide the courts in their analysis of the security interest question." WorldCom, 339 B.R. at 64 (citations omitted). Oregon adopted the uniform version of  UCC § 1-203, which reads as follows:

---

[5] The official comment states this section is "substantively identical to those portions of former Section 1-201(37) that distinguished 'true' leases from security interests, except that the definition of 'present value' formerly embedded in Section 1-201(37) has been placed in Section 1-201(28)." Section 71.2010(37) was in effect at the time of the agreement (2005), but section 71-2030 is substantively identical.

[6] The unusual posture of this adversary proceeding and the parties' myriad wide-ranging arguments further complicate analysis of this issue.

12

(1) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

(2) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

   (a) The original term of the lease is equal to or greater than the remaining economic life of the goods;

   (b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

   (c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal consideration upon compliance with the lease agreement; or

   (d) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

(3) A transaction in the form of a lease does not create a security interest merely because:

   (a) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

   (b) The lessee assumes risk of loss of the goods;

   (c) The lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording or registration fees or service or maintenance costs;

   (d) The lessee has an option to renew the lease or to become the owner of the goods;

   (e) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is performed; or

   (f) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(4) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

   (a) When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market value for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

   (b) When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

(5) The remaining economic life of the goods and reasonably predictable fair market rent, fair market value or cost of performing under the

13

lease agreement must be determined with reference to the facts and
circumstances at the time the transaction is entered into.

ORS § 71.2030 (2010).

### 3.    Mechanics of UCC § 1-203: The Bright-Line Test and The Facts and Circumstance Test

UCC § 1-203 makes it clear at the outset that the focus is on the facts of each case and that the
Court must "apply sequentially two distinct tests." WorldCom, 339 B.R. at 64. The first such test is the
"Bright-Line Test designed to provide the courts with a per se standard." Id. at 65. "The second test, to
be applied if the Bright-Line Test is not satisfied, is a contextual analysis that asks the court to determine
whether 'the facts of each case' demonstrate that a security interest was created." Id.

The Bright Line Test is designed to reveal "whether the contractual terms of the [a]greement,
either on their face or as applied, bear certain characteristics the statute defines as conclusive evidence
that a security interest was created" and involves two prongs. Id. The first prong focuses on the lessee's
right to terminate under the agreement. "If the consideration the lessee must pay for the term of the
lease is not subject to termination by the lessee, then the transaction meets the first prong of the test."
QDS, 292 B.R. at 332. The first prong "focuses not on whether a lessee has a contractual right to
terminate under the agreement in question, but rather on whether 'the consideration the lessee is to pay
the lessor for the right to possession and use of the goods is an obligation for term of the lease not
subject to termination by the lessee.'" QDS, 292 B.R at 334 (citing UCC § 1-203). Once the first prong
is satisfied, the court must then look, for satisfaction of the second prong, to see if any of the four factors
listed in UCC § 1-203(2)(a)-(d), known as the "Residual Value Factors," are present. Id. at 332-333. If
the first and second prongs of the Bright-Line Test are met, then UCC § 1-203 mandates a finding of a
security interest. However, as stated in the leading treatise on the issue,

> [f]ailure to meet one of [the Residual Value Factors in the Bright-Line
> Test] signifies only that the document is not conclusively a security
> agreement; the pinball has safely rolled past four holes each marked
> security agreement. Evasion of those four holes does not earn one enough
> points to become a lessee.

J. White & R. Summers, Uniform Commercial Code, § 30-3 Security Interest or Lease? at § d
Reversionary Interest. (2009). If a security interest is not established by the Bright-Line Test, then the
Court's focus shifts to the second of the sequentially distinct tests, the Facts and Circumstances Test,
under which the Court must examine all the facts and circumstances of the transaction.

To guide application of the Facts and Circumstances Test, the statute advises the circumstances
enumerated within 1-203(3)(a)-(f) do not create a security interest merely because they may be present
in the agreement/transaction between the parties. UCC § 1-203(3). "The 'key [the Court must

determine] is 'whether the lessor has retained a meaningful reversionary interest' [in the goods] at the end of the least term.'" <u>QDS</u>, 292 B.R. at 333 (citation omitted and first alteration in original).  In other words, "[i]f there is a meaningful reversionary interest-either an up-side or a down-side risk-the parties have signed a lease, not a security agreement.  If there is no reversionary interest, the parties have signed a security agreement, not a lease."   J. White & R. Summers, <u>Uniform Commercial Code</u>, § 30-3 Security Interest or Lease? at § d. Reversionary Interest.

### a.   <u>First Step in the Analysis: Application of the Bright-Line Test</u>

#### i.   <u>Prong One</u>: *Galadieu did not possess the right to terminate the agreement*

With respect to the first prong, the parties disagree whether Galadieu possessed the right to terminate the Agreement.  Rentrak points to the language of the Agreement and the separate addenda to support its position that (a) Galadieu could terminate, (b) any wind-down period subsequent to termination did not impose any further financial obligation on Galadieu, and (c) the requirement that Rentrak make available at least one Cassette through the end of lease term because any rentals would generate revenue for Galadieu (doc. # 59).  Ladieu concedes that on its face the Agreement contains a right to terminate, but argues it is not economically practicable to do so without purchasing the Cassettes. Ladiue further argues that pursuant to other terms of the Agreement, the obligation of lessee could extend as long as 182 days from the receipt of Cassettes, or even 90 days after the initial 182 lease term, during which time Galadieu would continue to incur continuing financial obligations (doc. # 57). Ladieu's analysis regarding Galadieu's lack of any meaningful right to terminate is sound.

The first prong of the Bright-Line Test "focuses not on whether a lessee has a contractual right to terminate under the agreement in question, but rather whether 'the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee.'"  <u>QDS</u>, 292 B.R at 334 (quoting UCC § 1-201(37)(2), precursor to UCC § 1-203).  Thus, "a termination provision in a contract which provides that a lessee remains financially liable to the lessor after termination of the lease for payments that become due after the date the lease is terminated does not constitute 'termination' within the meaning of [UCC § 1-203]."  <u>Ford Motor Credit Co. v. Hoskins (In re Hoskins)</u>, 266 B.R. 154, 160 (Bankr. W.D. Mo. 2001).  The salient inquiry is whether the lessee's payment obligation are subject to termination.  <u>QDS</u>, 292 B.R. at 334.

Here, Galadieu did not possess a right to terminate the Agreement in the sense contemplated in UCC § 1-203.  Rentrak argued that upon termination, Galadieu must return all Cassettes other than the one copy of each title required to be kept through the lease term (usually 26 weeks or 182 days),[7] and Galadieu only had an obligation to pay fees if it rented Cassettes during the applicable wind-down

---

[7] The Court notes that the Sony studio addenda required Galadieu to keep 50% of all Cassettes through the first 90 days of a lease term, 25% of all Cassettes through the first 120 days and, thereafter, at least one copy.

15

period (a minimum of 90 days after the last day of the applicable lease term (182 days)).  However,

under the Agreement Galadieu was required not only to keep at least one copy of the Cassette, but also

to make that copy available for rental.  PPT Agreement ¶ 2.4.  Whether he kept one or many Cassettes,

his rental of Cassettes necessarily led to Galadieu incurring certain fees during the wind-down period.

Additionally, upon rental, Galadieu owed a "Transaction Fee" "regardless of whether any revenue is

generated," with the amount of each fee set forth in the Studio Addenda.  See PPT Agreement 5.1.2 and

the Studio Addenda.  Furthermore, all of the other miscellaneous fees set forth in PPT Agreement and

Studio Addenda were continuing obligations of Galadieu.  Lastly, PPT Agreement section 5.2 provided

for two monthly fees, and there appears to be no reduction in these fees after termination, nor is there an

indication that these fees were suspended if no videos rented in a given month.  The consideration

Galadieu owed to Rentrak for the right to possession and use of the goods were continuing obligations

following termination through the date the Rentrak-Galadieu relationship fully ended, after the

applicable wind-down period. The Court therefore finds that Galadieu did not possess the right to

terminate the Agreement and the first prong of the Bright-Line Test is satisfied.

### ii. **Prong Two:** *The record is insufficient for the Court to determine whether Galadieu's option price to purchase the Cassettes was nominal*

Having found Galadieu did not have the right to terminate the Agreement, as that term is used in

UCC § 1-203, the Court turns to the second prong of the Bright-Line Test and the question of whether

any of the Residual Value Factors listed in UCC § 1-203(2)(a)-(d) are present, which, if present, would

necessarily "establish that a non-terminable 'lease' agreement is a disguised security agreement as a

matter of law." QDS, 292 B.R. at 332 n.9.  The parties' briefs focus on Galadieu's option to purchase

the Cassettes, implicating UCC § 1-203(2)(d).  The presence of this Residual Value Factor is determined

by deciding the question of whether "[t]he lessee has an option to become owner of the goods for no

additional consideration or for nominal additional consideration upon compliance with the lease

agreement." UCC 1-203(2)(d).

 "[UCC § 1-203] sets forth two tests for determining whether an option price is nominal: (1) the

option price is not nominal when the option to purchase is stated in the agreement to be the fair market

value of the property (the 'FMV Standard'); and (2) the option price is nominal if it is less than the

lessee's reasonably predictable costs of performing under the lease agreement if the option is not

exercised (the 'Option Price/Performance Cost Test')."[8] QDS, 292 B.R. at 335.  "'When the parties sign

the contract and become bound, they have either made a lease or a security agreement.  That agreement

---

[8] The Option Price/Performance Cost Test is also referred to as the Economic Realities Test which is focused on whether the lessee's only sensible option is to exercise the purchase option.  See QDS, 292 B.R. at 328-329 n.11; see also WorldCom, 339 B.R. at 66 n.8.

is based upon their judgments about values, useful life, inflation, risk of non-payment, and other

matters…foresight not hindsight controls.'" <u>WorldCom</u>, 339 B.R. at 67 (citing <u>White & Summers</u>, § 30-

3 at 9).  Thus, "the date of the transaction, rather than a future date, is the more appropriate point to

determine the adequacy of the option price." <u>In re Zaleha</u>, 159 B.R. 581, 586 (Bankr. D. Idaho 1993).

Whether the Court looks at FMV Standard or the Option Price/Performance Cost Test, the focus must be

on the value or cost anticipated at the time the agreement was signed. <u>See</u> <u>WorldCom</u>, 339 B.R. at 67-

69; <u>QDS</u>, 292 B.R. at 337-338.

      Based upon the record before it, and in particular in the absence of evidence as to the anticipated

costs at the time of entering into the transaction, the Court cannot make a determination as to

nominality.  In examining which nominality test applies here, the Court observes the Agreement does

not state that the option price to purchase the Cassettes will be their fair market value.  Thus, the FMV

Standard has no application here. <u>See</u> <u>QDS</u>, 292 B.R. at 335.  Turning to the Option Price/Performance

Cost Test, Rentrak emphasizes the current costs of returning the Cassettes via US Postal Service flat fee

box price, and argues Galadieu had a lower cost of performance as it could have shipped the Cassettes

back to Rentrak in bulk  (doc. # 59).   Ladieu argues that the costs of shipping, insurance, and employee

wages for time spent packing/shipping necessarily associated with a return of the Cassettes would have

been too high.  He therefore concludes that since the buyout fee was so much lower than the attendant

return costs, the only economical choice was for him to buy the Cassettes (docs. # 57 and 60).  The

parties' current estimates of performance, calculated as of the date of termination, cannot substitute for

evidence of the anticipated or expected costs of performance contemplated by the Rentrak and Galadieu

at the time they entered the Agreement.  The parties must present evidence as to the anticipated or

expected costs of performance, as of the time they entered into the Agreement, to establish a record

sufficient for a determination regarding nominality.

   **b.   <u>Second Step in the Analysis: Application of the Facts and Circumstances Test – The
        Nominality Issues Unresolved in the Bright-Line Test Prevent a
        Finding Under the Facts and Circumstances Test</u>**

      Though the Court will not apply the Facts and Circumstances Test until after its full analysis of

the Bright-Line Test, the Court notes that the nominality issues that prevent a finding in the Bright-Line

Test impede a resolution under the Facts and Circumstances Test.  If the "pinball has safely rolled past

four holes each marked security agreement," then the Court, with minimal guidance from the statute,

must analyze the facts of the case to determine whether the lessor has a meaningful reversionary interest

in the goods.   "The statute simply states that the determination of lease versus security interest should

be based on 'the facts of each case' and then enumerates five conditions that are not sufficient, standing

alone, to establish the existence of a disguised security interest." <u>QDS</u>, 292 B.R. at 341 (citation

17

omitted).  Failure to "include an explicit test for assessing whether a lessor has retained a meaningful reversionary interest . . . [has] created the same confusion and unpredictability in the caselaw."  Id.  "There seem to be as many different approaches to determining the existence of a meaningful residual interest as there are reported decision."  Id.

This Court adopts the rationale that a number of other courts have applied, utilizing the following factors to determine whether the lessor retained a meaningful reversionary interest:  (1) whether the option price is nominal, and (2) whether the lessee had the right to acquire equity in the goods.  See QDS 292 B.R. at 342-44; WorldCom, 339 B.R. at 71-73.  Analysis of the first factor is a "redundant examination of a factor necessarily considered before the court before the court may turn to the reversionary interest question."  WorldCom, 339 B.R. at 73.  As to the second factor, "the [c]ourt is essentially examining whether the contractual option price was set lower than the predicted FMV of the goods in order to reflect the equity interest in the goods that the lessee has previously accumulated, presumably by paying more in 'rent' than the parties would have agreed to in the absence of an interest to allow the lessee to accumulate such equity."  Id.  However, "this analysis merely asks in different terms whether the option price is nominal."  Id.  As in the Bright Line Test, nominality is an essential element of the Facts and Circumstance Test.  Since the Court cannot make a determination as to nominality on the current record, the Court will hold a trial to address it.

## D.  RENTRAK'S § 523 (a)(4) CLAIM IS CONTINGENT UPON A FINDING THAT LADIEU HAD A FIDUCIARY DUTY TO RENTRAK AND THAT BE DETERMINED WITHOUT A TRIAL

Rentrak asserts that Ladieu's conduct in failing to return the Cassettes, failing to remit rental revenues and failing to report performance data constitutes a defalcation of his fiduciary duty, and thus the corresponding debt is nondischargeable under § 523(a)(4).   Code § 523(a)(4) provides in relevant part:

> (a)      A discharge under section 727 [and certain other sections of the Code] does not discharge an individual  debtor from any debt –
>
> * * *
>       (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

§ 523(a)(4).  To "prevail on a claim of nondischargeability under Section 523(a)(4), the burden is on the party claiming nondischargeability, and the party must meet its burden by a preponderance of the evidence.  Exceptions to discharge under Section 523(a) must be strictly construed in favor of the debtor in order to comply with the 'fresh start' policy underlying the Bankruptcy Code."  In re  Duncan, 331 B.R. 70, 76 (Bankr. E.D.N.Y. 2005) (citations omitted).  A creditor must establish three elements in order to have a debt excepted from discharge under § 523(a)(4):

First, the debt must result from a fiduciary's defalcation under an 'express
or technical trust' involving the entrusting of money or other property to a
fiduciary for the benefit of another. Second, the debtor must have acted in
a fiduciary capacity with respect to the trust.   Third, the transaction in
question must be a "defalcation" within the meaning of bankruptcy law.

In re Duncan, 331 B.R at 77.  (citations omitted).

The fiduciary relationship required to invoke § 523(a)(4) must arise from an express or technical

trust.  In re Duncan, 331 B.R. at 77; Tannenberger v. Paeplow (In re Paeplow), 217 B.R. 705, 709

(Bankr. D. Vt. 1998); Congress Financial Corp. v. Levitan (In re Levitan), 46 B.R. 380, 384 (Bankr.

E.D.N.Y. 1985).  An express trust is one which arises out of an agreement between the parties.  In re

Levitan, 46 B.R. at 384; 4 Collier on Bankruptcy ¶ 523.10[1][d] (Alan N. Resnick & Harry J. Sommer,

eds., 16th ed.).  A technical trust is one created by statute or common law.  In re Paeplow, 217 B.R. at

709; 4 Collier on Bankruptcy, ¶ 523.10[1][d].  The long-standing requirement that there exists an

express or technical trust exists "prevent[s] the extension of the exception to ordinary commercial

debts."  The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes), 183 F.3d 162, 169

(2d Cir. 1999); see also In re Levitan, 46 B.R. at 385 (finding "an agreement which is essentially a

commercial security agreement in which the creditor has used trust language and imposed obligations on

the debtor to secure repayment of his loan does not create the fiduciary relationship required by §

523(a)(4)"); REL Commercial Corp. v. Materestky (In re Materetsky), 28 B.R. 499, 501-502 (Bankr.

S.D.N.Y. 1983)("[e]ven where parties to a contract expressly characterize the contractual relationship as

a trust, courts will look to the substance of the relationship rather than the language chosen to express it,

to determine whether a fiduciary relationship exists.").

While the existence of the "necessary fiduciary relationship under § 523(a)(4), is a question of

federal law, state law determines the existence of a trust."  In re Paeplow, 217 B.R. at 709.  In support of

its motion for summary judgment, Rentrak does not point to a specific state statute which creates a

fiduciary relationship between it and Galadieu, or between it and Ladieu (as sole member of Galadieu).

Instead, both parties' briefs focus on the alleged express trust created by the Agreement.  In Vermont,

"'an express trust arises because the parties intended to create it.'"  Savage v. Walker, 2009 VT 8, ¶8,

185 Vt. 603, 605, 969 A.2d 121, 124 (Vt. 2009) (citing 5 A. Scott, Scott on Trusts § 462.1 at 311 (4th

ed. 1989).  Indeed, "[n]o particularity of expression is necessary to the creation of an express trust in

personal property.  It is all a question of intent on the part of the declarant."  Methodist Church of

Sandgate v. First National Bank of North Bennington, 125 Vt. 124, 129, 211 A.2d 168, 172 (Vt. 1965).

Importantly, the legal effect of [the instrument said to establish the trust], as a conclusion of law, is also

open to determination by [the] Court."  Mahoney v. Leddy, 126 Vt. 98, 101, 223 A.2d 456, 458 (Vt.

1966).  Finally, "[t]he nature of that transaction and the relation of the parties may contribute to the

proof of the fiduciary relationship."  Mahoney, 126 Vt. at 101 (citing Connecticut River Savings Bank v.

Albee et al., 64 Vt. 571, 25 A. 487, 488 (Vt. 1892)).

Rentrak asserts that Ladieu stood as a fiduciary in two distinct ways under the PPT Agreement.

First, Rentrak relies upon the personal guarantee Ladieu executed in conjunction with the PPT

Agreement; it reads:

> The undersigned individual(s), in order to induce Rentrak to enter into
> with [Galadieu] the above Agreement do jointly and severally
> unconditionally and irrevocably guarantee to Rentrak, its successors and
> assigns, full and complete payment and performance by [Galadieu] of all
> the provisions, conditions, covenants, and agreements contained in the
> Agreement, do jointly and severally agree to the terms of the Agreement,
> expressly including the terms set forth in paragraphs 9.4 and 9.5, and do
> waive all notice of default by [Galadieu], notice of the acceptance of this
> guarantee by Rentrak and consent to any extension of time which may be
> given by Rentrak to [Galadieu] of time for payment or performance of any
> of [Galadieu's] obligations hereunder.

Guarantee, PPT Agreement (doc # 35-3, Ex. B).  Based upon this provision, Rentrak asserts that

Ladieu's guarantee of Galadieu's performance under the terms of the PPT Agreement includes

performance of fiduciary duties.  The fiduciary duty provision at issue states that Galadieu stood as a

fiduciary for Rentrak:

> [Rentrak] and [Galadieu] intend that this Agreement shall constitute a true
> lease of Cassettes between [Galadieu] as lessee and [Rentrak] as lessor.
> Ownership and legal title to the Cassettes shall not transfer or otherwise
> pass from Rentrak to [Galadieu] during or following the lease term unless
> you have properly accounted for the purchase of the Cassettes in
> accordance with the terms hereof and paid Rentrak all fees due including
> the applicable sell-through or end-of-term buyout fee.  [Galadieu] [has] a
> fiduciary duty to [Rentrak] to hold and remit all fees and charges to us and
> to report to Rentrak in accordance with the terms of this Agreement.
> [Galadieu] agree[s] to hold in trust for [Rentrak] [Rentrak's] share of the
> rental and sales proceeds [it] receive[s].

PPT Agreement ¶ 9.6 (doc # 35-3, Ex. B) (emphasis added).

Second, Rentrak argues that Ladieu controlled Galadieu and it was Ladieu's wrongful conduct

which caused Galadieu to breach its fiduciary obligations and cause Rentrak's losses.  In contrast,

Ladieu argues that his execution of the guaranty cannot establish the requisite fiduciary relationship

between him and Rentrak.  Furthermore, Ladieu argues that Rentrak's claims regarding his personal

tortious conduct and liability based upon his status as the sole member of Galadieu is a new theory of

liability not asserted by Rentrak until the summary judgment motion.

The Court must address two questions.  First, was Ladieu obligated to Rentrak in a fiduciary capacity under the PPT Agreement?  Second, if so, did Ladieu's actions constitute a defalcation within the meaning of § 523(a)(4)?  The Court turns to the PPT Agreement to determine whether a fiduciary relationship arose between Rentrak and Ladieu directly, or whether a fiduciary duty arose between Rentrak and Galadieu which may be imputed to Ladieu.  Vermont law instructs the Court to rely upon the Agreement to determine the intent of the parties as well as the nature of the transaction.  Ladieu argues that by executing the guaranty he may have guaranteed payment or performance, but did not agree to stand as a fiduciary to Rentrak.  This position has some support.  See In re Levitan, 46 B.R. at 387 (noting "[b]ut one who signs as primary guarantor to a fiduciary's agreement does not thereby make himself a fiduciary of the original agreement.").  However, given the dispute regarding Ladieu's intentions and obligations as guarantor, and the legal effect of the guaranty itself, the universe of undisputed facts in the record is insufficient for the Court to adjudicate these issues through summary judgment. The Court must reserve its decision on this point until after trial.  As to the existence of a fiduciary relationship between Rentrak and Galadieu, the Court notes that its determination of whether the Agreement is a true lease in connection with the § 523(a)(6) cause of action will illuminate the nature of the transaction.  That determination may not be dispositive of the fiduciary relationship issue, but the Court determines that it is appropriate to decide the § 523(a)(6) claim first because that claim is broader.  Additionally, an award under § 523(a)(6) may well encompass all the damages Rentrak seeks under § 523(a)(4).

For the foregoing reasons, the Court finds there are material facts in dispute which preclude a determination of whether Ladieu stood as a fiduciary and summary judgment may not enter under § 523(a)(4).  Moreover, the Court deems it most efficient to proceed to trial on the § 523(a)(6) claim prior to any further briefing or a trial on the § 523(a)(4) claim.

**E.  THE COURT DEFERS ITS DECISION ON LADIEU'S CROSS-MOTION FOR SUMMARY JUDGMENT UNTIL LIABILITY IS ASSESSED UNDER EITHER § 523(a)(6) OR (a)(4)**

Ladieu argues in his cross-motion for summary judgment that Rentrak's stated damages of $46,547.28 (1) are not conclusively established by the Oregon Judgment against Galadieu because of collateral estoppel; (2) are not permitted under the damages provision relied upon by Rentrak, ¶ 8.2.3 of the PPT Agreement, because it is an invalid liquidated damages provision, and the actual damages are much lower; and (3) include fees that are outside the scope of § 523 because they arise from an ordinary breach of contract claim.

Ladieu argues that, if found liable, the judgment should be limited to $3,454.00, this being the fees due prior to Rentrak's termination of the Agreement.  Rentrak counters that the correct doctrine

applicable to the enforceability of the Oregon Judgment is that of res judicata, and not collateral estoppel,; and ¶ 8.2.3 of the PPT Agreement is a valid liquidated damages provision.

Summary judgment on this issue is improper for three reasons.  First, Rentrak cannot rely upon the Oregon Judgment because the judgment is void *ab initio* since it was obtained in violation of the automatic stay.  Ladieu filed a petition for relief under chapter 7 of the Bankruptcy Code on December 12, 2007.  Rentrak filed the instant adversary proceeding on June 2, 2008.  Rentrak commenced a suit against Galadieu on September 23, 2008 (doc. # 59, Ex. A).  There is no dispute that, at that time, Rentrak knew Ladieu had filed a chapter 7 case and was thus protected by the automatic stay of § 362.  It appears Rentrak may have pursued this action specifically to establish company liability and fix the amount of damages for purposes of seeking to enforce a judgment against Ladieu.  Rentrak obtained its default judgment and money award on November 5, 2008  (doc. # 35-3, Ex. I).  Ladieu, as managing member of Galadieu, then filed an answer on behalf of Galadieu on November 17, 2008.   Rentrak filed the instant motion for summary judgment on March 16, 2009.  Although Ladieu did not specifically raise the issue of the automatic stay, the Court may raise the issue of the stay *sua sponte* and it is necessary in this case given the timeline of events.  See 222 Liberty Assocs. v. Prescott Forbes Real Estate Corp. (In re 222 Liberty Assocs.), 110 B.R. 196, 200 (Bankr. E.D. Pa. 1990); In re Heating Oil Partners, Civ. No. 3:08-CV-1976 (CSH), Bankr. No. 3:05-51271, 2009 WL 5110838, at *6, 2009 U.S. Dist. LEXIS 117871, at *20-21 (D. Conn. Dec. 17, 2009).

The automatic stay ordinarily does not apply to non-debtor co-obligors or co-defendants. Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287 (2d Cir. 2003) (citations omitted).  "The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence on the debtor's estate."  Id.  The Second Circuit set forth examples of actions where a claim will have an "immediate adverse economic consequence on the debtor's estate including (1) a claim against a non-debtor for an obligation for which the debtor was a guarantor, (2) a claim against the debtor's insurer, and (3) actions where there is an identity between the debtor and the third-party defendant that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor . . ."  Mokuba New York LLC, et. al. v. Pitts (In re Pitts), Bankr. No. 808-74860-reg, Adv. No. 809-8230-reg, 2009 WL 4807615, at 6, 2009 Bankr. LEXIS 4023, at *19 (Bankr. E.D.N.Y. Dec. 8, 2009) (citing Queenie, at 287-88).  Here, the automatic stay applied to Galadieu under the first and third examples. Ladieu was the guarantor of the non-debtor Galadieu's obligation.  Further, Ladieu is the sole member of Galadieu, and under the facts presented, this creates such an identity between Ladieu and Galadieu that a judgment for Rentrak against Galadieu for default under the Agreement would be a judgment in favor of Rentreak against Ladieu.  Queenie, 321 F.3d at

288 (applying the stay to a non-debtor corporation wholly owned by the debtor because adjudication of a claim against the non-debtor corporation would have an immediate adverse economic impact on the debtor); McCartney v. Integra Nat'l Bank North, 106 F.3d 506, 510-511 (3d Cir. 1997) (finding that where a debtor-guarantor would be secondarily liable for any deficiency entered against a non-debtor corporation and the non-debtor corporation had no assets, any action on the deficiency judgment against the non-debtor corporation would have been against the debtor-guarantor as the real party in interest and any deficiency judgment entered against the non-debtor corporation would operate as a judgment or finding against the debtor-guarantor, which is "an outcome clearly in tension with the purposes of the automatic stay."); The Robert Plan Corp. v. Liberty Mut. Corp., No. 09-CV-1930 (JS), Bankr. Case No. 09-08027, 2010 WL 1193151, at *3, 2010 U.S. Dist. LEXIS 27200, at *8-9 (Bankr. E.D.N.Y. March 23, 2010) (extending the stay to non-debtor officers of a debtor-corporation where the debtor-corporation would be liable to indemnify the non-debtor officers if they lost a contempt suit).  In light of the foregoing, the Court finds that the automatic stay extended to Galadieu under the first and third examples illustrated by Queenie and the Oregon Judgment is void *ab initio*.

Second, based upon the record, the Court is faced with significant factual questions regarding the value of the Cassettes.  This makes it impossible to fully assess the reasonableness of the damages provision at issue or to determine a proper award of damages and precludes summary judgment.  Under Oregon law, "whether a contract contains an unlawful liquidated damages clause is determined by a two-step inquiry."  Kesterson v. Juhl, 970 P.2d 681, 683, 157 Or. App. 544, 548 (Or. Ct. App. 1998). "First, [the Court] must determine whether the disputed clause actually is a liquated damages clause." Id. at 683, 157 Or. App. at 548.  "A liquidated damages clause consists or 'words of a contract that set the amount of damages to be recovered by one party from another in case of the latter's failure to perform as agreed.'"  DiTommaso Realty, Inc. v. Moak Motorcycles, Inc., 785 P.2d 343, 345, 309 Or. 190 (1990) (quoting Illingworth v. Bushong, , 297 Or. 675, 681, 688 P.2d 379 (1984)).  "Second, if the disputed clause is a liquidated damages clause, [the Court] must determine whether it is imposed as an unlawful penalty."  Kesterson, 970 P.2d at 683, 157 Or. App. at 548 (citing DiTommaso, 785 P.2d 343). The starting point for such a determination is:

> [d]amages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.  A term fixing unreasonably large liquidated damages is void as a penalty.

Id. at 683-84, 157 Or. App. 548-49 (citing Illingworth, 297 Or. at 692) (quoting ORS § 72.7180(1)).

The parties do not dispute that the PPT Agreement (and, in fact, the individual Studio Addenda) provide for liquidated damages in different provisions. With respect to Galadieu's failure to return the Cassettes, the parties focus on ¶ 8.2.3 of the PPT Agreement. However, Ladieu calls into question the validity of ¶ 8.2.3, asserting that the amount requested cannot be found to be reasonably related to Rentrak's actual damages. This paragraph of the PPT Agreement calls for payment of $30-$65 per Cassette upon Galadieu's failure to return Cassettes under the Agreement (depending on when the request for their return is made in relation to the street date of particular Cassettes: $65 if the request comes before 90 days after the particular Cassette's street date, and $30 if the request comes after the initial 90 days). However, Ladieu points to Studio Addenda provisions, which specifically provide for lower fees for the improper sale of Cassettes prior to the passage of approximately 30 days from the initial street date of a Cassette (e.g. the Fox Studio Addenda ¶ 6.5 ($16-32)). Ex. B. in the App. of Exs. to Rentrak's Mtn. (doc # 35-3). As further support for his argument, Ladieu points out that Galadieu had the option to purchase Cassettes at the end of the lease terms for as little as $0.75. In addition to noting that pursuant to the Agreement, the Studio Addenda fees may be imposed in addition to fees under the PPT Agreement, the Court finds such wildly different values placed on the Cassettes to be evidence that the estimate in the PPT Agreement was not per se reasonable.[9]

Third, and finally, the parties' briefs confuse the issue of which damages provision applies to which causes of action. The Court notes that at least two provisions of the PPT Agreement, ¶¶ 6.2, 8.2.3, and others in the Studio Addenda, in some way contemplate missing Cassettes or Cassettes sold prior to the permitted to sale date. These provisions may be applicable in assessing damages should Rentrak prevail on § 523(a)(6) for the loss of its Cassettes. Conversely, Rentrak's § 523(a)(4) claim focuses on Ladieu's alleged defalcation of monies due Rentrak, consisting of fees and charges and performance data, all of which Rentrak claims Ladieu held in trust as a fiduciary. Of course, recovery under § 523(a)(4) requires a determination that Ladieu stood as a fiduciary. Nevertheless, Ladieu argues some of the claimed charges are unrecoverable because they essentially arise out of breach of contract claims, while conceding if a fiduciary relationship is found, approximately $3,454.00 may be due for failure to remit rental revenue (doc. # 36). Just as multiple provisions may apply to lost or sold Cassettes, it appears the fiduciary relationship provision (¶9.6) must be read in conjunction with other provisions including, but not limited to, those regarding the amount of fees due (¶5 inclusive), failure to report performance data (¶8.2.4) and any applicable provisions of the Studio Addenda. Ultimately, if

---

[9] The Court notes that in one case cited by Rentrak in support of its motion, another bankruptcy court similarly questioned Rentrak's valuations of cassettes, and after an evidentiary hearing, held that the proper amount to assess to the cassettes was $10.00 each. See Rentrak Corp. v. Johnson d/b/a Lake Cable Video (In re Johnson), (No. 6:05-AP-00219-ABB, 2006 WL 2460712 (May 12, 2006, Bankr. M.D. Fla.)

Rentrak is successful at trial under §§ 523(a)(4) or (a)(6), the Court will determine which liquidated damages provision is applicable and whether such provision is a valid liquidated damages provision, as the prerequisite to fixing the amount of damages.

## CONCLUSION

For the foregoing reasons, the Court finds there are material facts in dispute with respect to Rentrak's §§ 523(a)(4) and 523(a)(6) claims, and , hence denies the cross-motions for summary judgment on those causes of action.  Likewise, there are material facts in dispute with respect to damages and the Court therefore also denies summary judgment on Ladieu's liquidated damages claim. With respect to the choice-of-law issue, the Court determines that Oregon law applies to the contract issues and Vermont law applies to the tort issues raised in this adversary proceeding.  The Court will schedule a trial to adjudicate the material facts in dispute with respect to the § 523(a)(6) claim, i.e., the nominality and whether the Agreement is a true lease.  The Court defers resolution of the § 523(a)(4) claim and the liquidated damages claim until after it rules on the factual and legal issues to be presented at trial.

The Court has considered all of the arguments of the parties, and to the extent any argument is not specifically addressed herein it is because the Court has found it to be without merit.

This memorandum of decision constitutes the Court's findings of facts and conclusions of law.

February 24, 2011
Burlington, Vermont

Colleen A. Brown
United States Bankruptcy Judge