Formatted for Electronic Distribution                                              Not for Publication

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____

**In re:**

    **Gregory Ladieu,**                                        Chapter 7 Case
        **Debtor**                                             # 07-10868
_____

**Rentrak Corporation,**
        **Plaintiff,**            Filed & Entered
    v.                                  On Docket
                                            November 4, 2011           Adversary Proceeding
**Gregory Ladieu,**                                                    # 08-1010
        **Defendant.**
_____

*Appearances*:  W. Scott Fewell, Esq.                              David W. Lynch, Esq.
                Burlington, VT 05402                                Colchester, VT 05446
                Attorney for Plaintiff                              Attorney for Defendant

### MEMORANDUM OF DECISION

        On June 2, 2008, Plaintiff, Rentrak Corporation ("Rentrak") filed a two-count complaint against the Defendant-Debtor, Gregory Ladieu, seeking a declaration that the amounts Mr. Ladieu owes to Rentrak under the agreement between Rentrak and Mr. Ladieu's company, Galadieu Enterprises LLC ("Galadieu"), are non-dischargeable under §§ 523(a)(4) and (a)(6) of the Bankruptcy Code (the "Code").[1] Mr. Ladieu filed an answer (doc. # 5), which contained affirmative defenses (unclean hands and failure to state a claim) and a counterclaim for attorney's fees and costs. On July 22, 2008, Rentrak filed an answer to the counterclaim, affirmative defenses (unclean hands and failure to state a claim), and a request for attorneys' fees (doc. # 8).

        The parties then filed cross-motions for summary judgment. In its motion for summary judgment (doc. # 35), Rentrak sought a judgment on its claims that Mr. Ladieu's obligations to Rentrak were nondischargeable under §§ 523(a)(4) and 523(a)(6). Mr. Ladieu filed opposition to the motion for summary judgment and a cross-motion for summary judgment (doc. # 36). Mr. Ladieu's opposition requested that the Court deny Rentrak's motion because Mr. Ladieu did not owe Rentrak a fiduciary duty,

---

[1] All statutory citations refer to Title 11, United States Code (the "Bankruptcy Code") unless otherwise indicated.

1

and there were disputes regarding material facts determinative of whether Mr. Ladieu willfully or maliciously converted Rentrak's property. At a hearing on January 5, 2010, the Court granted Mr. Ladieu's motion to reopen summary judgment pleadings (doc. # 50) to allow Mr. Ladieu to brief new legal issues in light of the Court's ruling in Nanak Resorts, Inc. v. Haskins Gas Service, Inc. (In re Rome Family Corp.), 407 B.R. 65 (Bankr. D. Vt. 2009) (hereafter the "Rome decision"). Both parties filed memoranda of law. (docs. ## 57, 58, 60, 62). In his memorandum of law, Mr. Ladieu asserted as another point of opposition to the Rentrak's motion that the agreement entered into between the parties is not a lease, but rather is a disguised security agreement (doc. #57).

Mr. Ladieu's cross-motion for summary judgment (doc. # 36) sought a ruling that, in the event the Court granted Rentrak summary judgment on the issue of liability, no damages are due because the damages Rentrak seeks, in the amount of $46,547.28, are unreasonable and unenforceable. His rationale for this position was: (1) the damages are not conclusively established by Rentrak's judgment from Oregon state court (the "Oregon Judgment") against Galadieu; (2) the damages are not properly set by the damages provision relied upon by Rentrak, Section 8.2.3 of their agreement; and (3) a portion of the fees Rentrak seeks are outside the scope of § 523(a) as they arise from an ordinary breach of contract claim.

On February 24, 2011, the Court issued a memorandum of decision and order (doc. # # 65, 66) denying summary judgment on Rentrak's §§ 523(a)(4) and 523(a)(6) claims, denying summary judgment on Mr. Ladieu's claim that the liquidated damages provision is unreasonable, determining Oregon law applies for Rentrak's contract claims and Vermont law applies to any tort claims, declaring the Oregon Judgment void ab initio as having been obtained in violation of the automatic stay, setting trial on Rentrak's § 523(a)(6) claim, and deferring trial on all remaining issues pending the outcome of that trial.

On June 2, 2011, Mr. Ladieu filed an amended counterclaim to add a claim for damages resulting from Rentrak's violation of the automatic stay, requesting attorney fees, actual damages, compensatory damages, and punitive damages (doc. # 82). Rentrak filed its answer and affirmative defenses (failure to state a claim, waiver, laches, and "the unusual circumstances" exception upon which the Court's decision was based has not been adopted by the Ninth Circuit) (doc. # 83).

Rentrak filed a memorandum of law requesting this Court reconsider its ruling that Rentrak violated the automatic stay when it obtained Oregon Judgment against Galadieu (doc. # 86), and Mr. Ladieu responded in opposition (doc. # 90). By Order dated June 17, 2011, the Court affirmed its decision that Rentrak's Oregon Judgment was obtained in violation of the automatic stay and is void ab initio, but reserved decision as to damages until after trial at which Mr. Ladieu would have the burden of proving actual damages as well as whether additional grounds existed for the imposition of punitive damages (doc. # 93).

2

Prior to trial, the Court issued an Order determining that Mr. Ladieu had the burden of proof on the issue of whether the parties' agreement was a true lease or a disguised security interest (doc. # 89). The Court conducted a trial on the § 523(a)(6) cause of action on June 22nd and 23rd, 2011. At trial, Rentrak made a motion under Fed. R. Civ. P. 52 seeking judgment on partial findings with respect to the issue of the nature of the parties' agreement. The Court granted Rentrak's Rule 52 motion by oral ruling made on June 23, 2011, determining that Mr. Ladieu failed to meet his burden of proof, and as result, the agreement would be treated as a true lease for purposes of the adversary proceeding.

The Court heard closing arguments on July 5, 2011. The parties filed post-trial memoranda of law (doc. ## 105 and 106) and responses (doc. ## 107 and 108), and the Court took the matter under advisement as of August 19, 2011.

Based upon the record in this proceeding, including the pleadings filed, the evidence and arguments presented at trial, and all post-trial oral arguments and briefing, and for the reasons set forth below, judgment is granted in favor of Rentrak and against Mr. Ladieu on the § 523(a)(6) claim. As to the measure of damages for Rentrak's violation of the automatic stay, the Court finds Mr. Ladieu did not meet his burden of proof with respect to actual damages and punitive damages are not warranted.

## JURISDICTION AND RELEVANT LAW

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(G), (I), and (K).

## FACTUAL BACKGROUND

Mr. Ladieu, as its sole member, formed Galadieu in order to purchase a Showtime Video and Big Scoop Ice Cream Shop ("Showtime") in Swanton, Vermont. In his operation of Showtime, Mr. Ladieu rented and/or sold pre-recorded video cassettes which included VHS, Blu-ray, and DVD. On May 31, 2005, Rentrak and Galadieu d/b/a Showtime Video entered into a general pay-per-transaction agreement (the "PPT Agreement"). Rentrak and Galadieu also entered into studio addenda with Lions Gate (dated May 31, 2005), Fox (dated May 31, 2005), Sony (dated November 17, 2005), and Paramount (dated September 2005) (the "Studio Addenda") (collectively the PPT Agreement and the Studio Addenda are referred to as the "Agreement"). Mr. Ladieu signed the PPT Agreement and the Studio Addenda on behalf of Galadieu. Mr. Ladieu also executed a personal guarantee of Galadieu's obligations under the PPT Agreement. Pursuant to the Agreement, Rentrak leased pre-recorded VHS, Blu-rays, and DVDs (the "Cassettes") to Galadieu based on a revenue sharing arrangement for Galadieu's retail customers to rent and/or purchase. The PPT Agreement contained general terms and obligations, and the Studio Addenda contained additional lease terms, with the revenue sharing percentages for Cassettes established on a title-by-title basis by the reproducing studio(s). The Agreement required Galadieu to remit to Rentrak certain monies/fees generated by Galadieu's rental and sale of Cassettes. Galadieu's remittal obligations

3

included, but were not limited to, a minimum monthly fee, a minimum transaction fee and/or a percentage of the revenue obtained from rental of the Cassettes, a percentage of collected late fees, and a fee for the purchase of Cassettes or a percentage of revenue received from the sale of Cassettes. Sometime in early November 2007, Mr. Ladieu decided to close the store and notified Rentrak of his decision. On November 8, 2007, Rentrak sent a notice of default and intent to enforce letter (the "Default Letter") advising him that the Galadieu account was in default. On November 27, 2007, Rentrak sent a notice of default and contract termination and demand for return of property (the "Termination Letter"). The Termination Letter included an inventory of the 899 Cassettes in Galadieu's possession, and instructed Galadieu to return the inventory in their original boxes within 15 days, and stated that any product not returned in the original boxes would not be credited to Galadieu's account. There is no dispute that Mr. Ladieu received the Termination Letter. In late November and early December 2007, Galadieu sold its Cassettes on a cash only basis. In late November or early December 2007, Mr. Ladieu created a generic "movie" entry in Galadieu's computer system under which he entered the sales of all inventory, including the Cassettes. There is no dispute that Galadieu initiated a "blow out sale" after receiving the Termination Letter, and from that time until December 10, 2007, Galadieu sold the Cassettes initially for $10, then for $5, and finally for $1 per cassette. Mr. Ladieu terminated business operations on December 10, 2007. The total amount of income Galadieu generated from the sale of the Cassettes during the period of November 7 through December 15, 2007 was between $7,893.00 and $12,100.92. Mr. Ladieu used this income to pay business and tax obligations; he used none of this income to pay Rentrak. On December 27, 2007, Mr. Ladieu filed a petition for relief under chapter 7 of the Bankruptcy Code. Rentrak filed the instant adversary proceeding on June 2, 2008.

## DISCUSSION

### **Mr. Ladieu's Obligations to Rentrak are Nondischargeable Under 523(a)(6)**

Rentrak asserts that Mr. Ladieu's conduct constitutes a conversion of the Cassettes, and thus his debt is excepted from discharge under § 523(a)(6), which provides in relevant part:

> (a)   A discharge under section 727 [and certain other sections of the Bankruptcy Code] does not discharge an individual debtor from any debt –
>
> * * *
>
>    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6). To prevail under this provision, the plaintiff must prove the acts or conduct of the debtor caused a willful and malicious injury. Kawaauhau v. Geiger, 523 U.S. 57, 63, 188 S. Ct. 974, 978 (1998). The use of the word willful "indicates 'a deliberate or intentional *injury*, not merely a deliberate

4

or intentional act that leads to injury.' The injury caused by the debtor must also be malicious, meaning 'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.'" Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006) (citations omitted and alteration in original). "Malice may be constructive or implied . . . Implied malice may be demonstrated 'by the acts and conduct of the debtor in the context of [the] surrounding circumstances.'" Navistar Fin. Corp. v. Stelluti (In re Stelluti), 94 F.3d 84, 88 (2d. Cir. 1996) (citation omitted). "A creditor seeking to establish nondischargeability under § 523(a) must do so by the preponderance of the evidence." Ball, 451 F.3d at 69 (citation omitted).

In Vermont, proving the tort of conversion requires that the "owner of property must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title. Conversion may also be committed by retention of the property after the owner's rightful demand." P.F. Jurgs & Co. v. O'Brien, 160 Vt. 294, 299, 629 A.2d 325, 328-29 (Vt. 1993) (citation omitted). "The key element of conversion, therefore, is the wrongful exercise of dominion over property of another." Id. at 299, 629 A.2d 329. A party making a claim for conversion "must show an immediate right to possession." Miller v. Merchants Bank, 138 Vt. 235, 239, 415 A.2d 196, 199 (Vt. 1980); see also Ag Venture, Fin. Servs, Inc. v. Montagne (In re Montagne), 413 B.R. 148 (Bankr. D. Vt. 2009). The burden in proving conversion is upon the plaintiff. Peck v. Patterson, 119 Vt. 280, 282, 125 A.2d 813, 815 (Vt. 1956).

On November 7, 2011, after learning of Mr. Ladieu's decision to close the store sometime in late November or early December, Rentrak e-mailed Mr. Ladieu's wife a list of Blu-rays and DVDs that had yet to reach the "sell-thru date," with the acknowledgement that some of the cassettes would be available for sale during the closing as long as they passed their sell-thru date (Def. Ex. P). On November 8, 2007, Rentrak sent the Default Letter demanding payment of $3,035.73 in general revenue sharing, access fees, and guaranty fees by November 15, 2007. This Default Letter did not contain a demand for return or tapes, nor did it inform Mr. Ladieu the terms of the Agreement prohibited him from selling Cassettes. After not receiving the payment demanded in the default letter, Rentrak decided to terminate its Agreement with Galadieu and sent the Termination Letter. This Termination Letter demanded return of all Rentrak property:

> The Agreement requires the return of the product, ***in their original boxes***, within 15 days from receipt of demand. For your convenience, we have enclosed a copy of the inventory of the product currently in your possession. Product returned without the necessary return authorization number below will be refused. Product returned without their original boxes, non-PPT product and/or product that is no listed on the enclosed Legal Inventory ***will***

5

> *not* be credited to your account nor returned. If the product is not returned within 15 days, you will be charged the contractual price for each item, the total of which is currently $41240.00. Please **properly insure your shipment** and reference the Return Authorization Number clearly on 3 sides of each carton of your return.

(Def. Ex. O) (emphasis in original). Mr. Ladieu testified that upon receipt of this letter, he called Rentrak and an employee of Rentrak told him he had to return the Cassettes in their original boxes, with their original artwork with all stickers or labels removed, and further, that if he returned Cassettes in their security boxes (which, according to the testimony of Rentrak's representative, were exactly the same as the original box but with a strip for a security device), or if the artwork was damaged due to stickers or labels, Galadieu would not receive any credit for the Cassette. Rentrak produced documents showing various communication logs and telephone records, none of which showed a record that this telephone call occurred. Rentrak's representative testified that other retailers have returned cassettes in security cases and it was rare for the artwork to come back without labels or stickers, and these cassettes were accepted and credited to the retailer's account because Rentrak's main goal was the return of the cassettes.

While Mr. Ladieu provided credible testimony throughout the trial, Mr. Ladieu failed to establish that this telephone conversation with the Rentrak representative took place. Mr. Ladieu had knowledge that Rentrak demanded return of its product, and allegedly on the basis of this undocumented telephone conversation he made the decision to sell the Rentrak Cassettes. He asserts that he weighed the fact that he would not receive credit for many of Cassettes, either because he no longer had the original boxes, the artwork was damaged, or because it would take too long to process the return against the possible financial penalty of selling the Cassettes himself. He testified that he decided to hold the sale because his financial circumstances were dire, he had bills to pay and he had nothing to lose if he would get no credit for return of the Cassettes. He testified he used money generated from the sale of the Rentrak Cassettes to pay taxes and other store expenses. Based upon the record and testimony at trial, the Court finds that, after Rentrak's demand for the return of the cassettes, Mr. Ladieu appropriated the Cassettes to his own use and sold them for his own benefit. Thus, Rentrak met its burden of proof on the issue of Mr. Ladieu's conversion of the Cassettes, as required for a judgment on the § 523(a)(6) cause of action.

### The Measure of Damages Due to Rentrak

In its post-trial memorandum, Rentrak's stated prayer for damages relating to missing Cassettes is $41,145.00[2] and is based on the value it places on three categories of revenue streams from the Cassettes:

---

[2] The difference between this amount and the $46,547.28 referenced in the complaint equals $5,402.28, which is the outstanding account balance due under the Agreement for access/usage fees, shipping fees, guarantee shortfalls and end-of-term buyout fees (Def. Ex. O). The shipping fees and access/usage fees are dischargeable as these are purely contractual damages and hence are dischargeable. See Rentrak Corp. v. Johnson (In re Johnson), No. 6:05-BK-07768-ABB, Adv. No.

(1) a percentage of rental/sale income; (2) sale or value of the Cassettes; and (3) revenue obtained from Rentrak's use of information obtained under the Agreement's reporting obligations. From the cross-motions for summary judgment through trial, the parties' arguments regarding damages focused on provisions in the PPT Agreement and the Studio Addenda, all of which purported to set forth damages to compensate Rentrak for the loss of these revenue streams, either individually or collectively. At trial, the testimony encompassed various provisions, but generally centered on two subsections within Section 8 of the Agreement – 8.2.3 and 8.2.4. The Court requested Rentrak clarify under which section it sought damages. In its post-trial memoranda, Rentrak asserted that it sought damages under Section 8.2.3.[3] This section of the Agreement reads:

> 8.2.3 All PPT Cassettes returned us will be in good condition (normal wear and tear accepted) and shipped in their original packaging. If you do not return PPT Cassettes or the PPT Cassettes are not returned in good condition, then you will be required to pay us $65 per PPT Cassette if we requested return of the Cassette within ninety days of the title's street date and $30 per PPT Cassette if the request is made more than ninety days after the title's street date.

Mr. Ladieu argues this is an unenforceable liquidated damages provision because the values assigned to the Cassettes are unreasonable and are substantially higher than the actual damages Rentrak suffered as a result of his sale of Cassettes.

Under Oregon law, "whether a contract contains an unlawful liquidated damages clause is determined by a two-step inquiry." Kesterson v. Juhl, 970 P.2d 681, 683, 157 Or. App. 544, 548 (Or. Ct. App. 1998). "First, [the Court] must determine whether the disputed clause actually is a liquated damages clause." Id. at 683, 157 Or. App. at 548. "A liquidated damages clause consists or 'words of a contract that set the amount of damages to be recovered by one party from another in case of the latter's failure to perform as agreed.'" DiTommaso Realty, Inc. v. Moak Motorcycles, Inc., 785 P.2d 343, 345, 309 Or. 190 (1990) (quoting Illingworth v. Bushong, , 297 Or. 675, 681, 688 P.2d 379 (1984)). "Second, if the disputed clause is a liquidated damages clause, [the Court] must determine whether it is imposed as an unlawful penalty." Kesterson, 970 P.2d at 683, 157 Or. App. at 548 (citing DiTommaso, 785 P.2d 343). The starting point for such a determination is:

---

6:05-AP-00219-ABB, 2006 WL 2460712, *3 (Bankr. M.D. Fla. May 12, 2006). The remaining balance for guarantee shortfalls and end-of-term buyout fees are subsumed within the liquidated damages provision.

[3] Even with this clarification, it appears to the Court that damages contemplated in Section 8.2.3 would compensate Rentrak for only losses under the first and second revenue streams, whereas Section 8.2.4 would compensate Rentrak for a "default [which] consists of failure to report rental or sale transactions" which seemingly falls within the third revenue stream. Nevertheless, the Court finds Rentrak is owed damages for all three streams of revenue and a single value must be assigned. It will use the values in Section 8.2.3 as a starting point to determine whether that liquidated damages provision is enforceable as written.

7

> [d]amages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

Id. at 683-84, 157 Or. App. 548-49 (citing Illingworth, 297 Or. at 692) (quoting ORS § 72.7180(1)).  The party opposing the liquidated damages provision has the "burden to prove that the measure of damages is unreasonably large in relation to the anticipated or actual damages.  Kesterson, 970 P.2d at 684; Wells Fargo Bank, N.A. v. The Ash Org., No. 09-CV-188-MO, 2010 WL 2681675, at *10 (D. Or. July 2, 2010).

Section 8.2.3 is a liquidated damages provision.  As Rentrak's representative testified, liquidated damages provisions are found throughout the Agreement because of variables such as relative popularity of certain titles, scarcity of titles, timing of loss with relation to street date, and inability to definitively value the rental and sale information.  Section 8.2.3 is one such example of a liquidated damages provision.  Having determined that the Section 8.2.3 is a liquidated damages provision, the Court proceeds to step two of the inquiry: are the damages unreasonably large in relation to anticipated or actual damages?  Under Section 8.2.3, Rentrak seeks $65 per Cassette for titles still within 90 days of street date as of the Termination Letter, and $30 per Cassette for titles more than 90 days from street date as of the Termination Letter, for total damages of $41,145.00.  Based upon the record, the Court concludes that this amount of damages is unreasonably high.

The trial testimony and post-trial memoranda of law focused on the value of the Cassettes.  Rentrak relies upon the values set forth in Section 8.2.3 of the PPT Agreement.  Mr. Ladieu focuses on the fair market value of the Cassettes when sold.  However, even though Mr. Ladieu testified that he sold the Cassettes for $10, then $5 and finally $1, he argues the fair market value is either $7 or $3.  Neither parties' valuation is factually or legally substantiated.  Rentrak's valuation is too high because it greatly exceeds what Rentrak described as its actual financial return on the Cassettes, while Mr. Ladieu's valuation is too low because it fails to take into account the lost rental/sales income or the value of the rental/sales information to which Rentrak is entitled.

Under a Rentrak-retailer relationship in good standing, the Studio Addenda normally set the "value" of the Cassettes.  Generally, until a pre-determined date after a title's street date, if a particular Cassette is reported or discovered lost, stolen or missing from the store inventory a penalty fee is charged.  After the retailer rents the Cassettes for some pre-determined amount of time following the street date, the retailer has the option to either purchase the Cassettes for a small sell-through fee, which was a fraction of the penalty for losing a Cassette during the initial period, or to continue to place it for rental.  At the end of the lease term, the retailer can obtain the Cassette for an even smaller buyout fee.  As an example,

under the Lions Gate addenda, until the 29th day after a title's street date, if the Cassette is missing from the store inventory a fee of $22.00 per unit is assessed. On the 29th day after the title's street date, the retailer may sell a DVD provided the retailer pays Rentrak the greater of $2.75 or 39% of the sale revenue. At the end of the 26-week lease term, the retailer can obtain the DVD for $0.75 or return it to Rentrak for credit. Rentrak's representative testified that if a retailer returns product, based upon its agreement with the studios, Rentrak either destroys the Cassettes or sells the Cassettes on the secondary market for $0.19 to $2.50. Mr. Ladieu testified that he never returned Cassettes at the end of term. If a Rentrak-retailer relationship falls out of good standing, and Rentrak takes steps to terminate the overall Agreement, Rentrak would seek to collect the much higher $65/$30 split set forth in Section 8.2.3 from the retailer for the unreturned Cassettes.

As early as June 2007, Rentrak became aware that some Cassettes were missing from Showtime Video (Def. Ex. G). Even though the Studio Addenda provided that the addenda penalty would be in addition to any PPT Agreement penalties, Mr. Ladieu was generally charged only the applicable Studio Addenda sell-thru rates for most of the units, was charged an amount slightly less than the Studio Addenda penalty for one title missing prior to sell-thru date, and received an invoice for $306.45 (Id.). As his business failed, Mr. Ladieu decided to sell the Rentrak Cassettes in his inventory, which at that time consisted entirely of a few Blu-rays, but mostly DVDs. This "blowout sale" occurred after Rentrak terminated the Agreement, thus Rentrak argues for the full penalty found in Section 8.2.3 of the PPT Agreement, rather than the amounts in the Studio Addenda.

Rentrak's representative testified that the $65/$30 split found in the 2005 PPT Agreement was written at a time when the wholesale costs for new product of VHS and DVD units was $65.00 and $30.00, respectively. As referenced at trial and in the attachment to Rentrak's post-trial memorandum, the amount charged under Rentrak's new model PPT Agreement is $25.00 for Blu-rays and $18.00 for DVDs. As an explanation for the huge disparity in value between the Studio Addenda penalty, the sell-through price, and end-of-term buyout price, Rentrak's representative testified that the value of most Cassettes dropped off dramatically over time. Furthermore, Studio Addenda were frequently amended, typically in favor of the retailers, when the studios decided that the sell-through and buyout fees were too high. Mr. Ladieu's post-trial memoranda argue the market value of the Cassettes was between $3.00 and $7.00, however the Court finds no evidence to support this in the record. At trial, Mr. Ladieu testified he sold the Cassettes for $10.00, then $5.00, and finally $1.00. Mr. Ladieu acknowledges that some of the Cassettes were sold prior to the sell-through date, but argues that a significant portion were in the sell-through period or buyout period and thus the value of the Cassettes is much lower than the amount claimed by Rentrak, as evidenced by the Studio Addenda.

9

Rentrak's representative testified that Mr. Ladieu's sale of the Cassettes deprived it of valuable information relating to the rental/sale information it could have obtained from the last week of November when the sale started through December 10th when the store closed. However, Rentrak's representative could not place a value on this information, and pointed to this as one justification for the liquidated damages provision. Mr. Ladieu argued that Rentrak would not have realized any income rental/sale information on the Cassettes because had Mr. Ladieu returned the Cassettes there would no longer be any rentals/sales information to gather and, moreover, Rentrak destroyed most of the product upon return.

The Court finds that the Cassettes have value under all three revenue streams and Mr. Ladieu's actions deprived Rentrak of (1) a percentage of the expected rental/sale income; (2) sale or value of the cassettes; and (3) revenue obtained from Rentrak's use of information obtained under the Agreement's reporting obligations. The hard value of the Cassettes is dependent on many factors such as title popularity and media type (newer technology versus older technology), and it is clear that as time passed, the value of the Cassettes dropped dramatically, down to approximately $3.00 within a month or two of circulation, and lower as the lease term approached its expiration date. Prior to termination of the Rentrak Agreement, Rentrak charged the retailer a fee for missing Cassettes that was approximately one-half to one-third of the amount it charged if the relationship was terminated. The volume of rental/sale information typically declines over time for most titles. As to the value of the rental/sale information, Rentrak's representative testified that it obtains sales/rental information from a large number of retailers and other sources, packages that information, and sells to its consumers. Rentrak's representative testified she was unable to put a value on information gleaned from a specific store for a specific period of time. Here, the period of time for which information is missing from one store is approximately three weeks.

The Court must assess damages for Mr. Ladieu's breach. The damages must encompass the hard value of the Cassettes, and also include a premium for the percentage of lost rental/sale revenue and a premium for lost rental/sale information. The Court finds it would be unreasonable to set damages using the $65/$30 split stated in Section 8.2.3 because it significantly exceeds the actual harm to Rentrak. The hard value of the Cassettes clearly was indubitably less than the amounts Rentrak seeks, and Rentrak has failed to establish that the loss of rental / sale information from one store for a period of three weeks accounts for the difference between the value of the Cassettes and the amount of damages it seeks. When a sister bankruptcy court faced a similar damages assessment question in a case involving Rentrak, it noted that the value of each video correlated to various factors including its age, popularity, and condition, and concluded that a value of $10.00 was the proper and reasonable measure of damages. <u>Rentrak Corp. v. Johnson (In re Johnson)</u>, No. 6:05-BK-07768-ABB, Adv. No. 6:05-AP-00219-ABB, 2006 WL 2460712, *4–6 (Bankr. M.D. Fla. May 12, 2006).

Given the fact that some of the 899 Cassettes were at their end-of-term phase and eligible for purchase for a small fee, and that many of the other Cassettes were in the sell-through period and could be sold provided a percentage/fee of approximately $3.00, the Court believes a value of $10.00 per Cassette will compensate Rentrak here for its entire loss under the three revenue streams. Thus, the Court will assign a value of $10.00 to each of the 899 Cassettes and enter judgment in favor of Rentrak for the amount of $8,990.00.

### An Award of Damages Is Not Warranted for Rentrak's Violation of the Automatic Stay

In the memorandum of decision on the cross-motions for summary judgment (doc. # 65), this Court determined that the Oregon state court judgment against Galadieu and relied upon by Rentrak in its complaint and motion for summary judgment was obtained in violation of the automatic stay. The Court reasoned that the automatic stay extended to Galadieu under the first and third examples of the Second Circuit's Queenie standard. See Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287 (2d Cir. 2003) (citations omitted); see also Mokuba New York LLC, et. al. v. Pitts (In re Pitts), Bankr. No. 808-74860-reg, Adv. No. 809-8230-reg, 2009 WL 4807615, at 6, 2009 Bankr. LEXIS 4023, at *19 (Bankr. E.D.N.Y. Dec. 8, 2009) (citing Queenie, at 287-88). Following this decision, Rentrak asked the Court to revisit its decision and restore the Oregon judgment. By Order dated June 17, 2011, the Court affirmed its decision regarding the automatic stay violation, but did not reach the issue of damages raised in Mr. Ladieu's amended counterclaim. The Court noted that Mr. Ladieu held the burden of proving actual damages and whether additional grounds existed for the imposition of punitive damages under § 362(k). Malicki v. Bernstein, 447 B.R. 684, 704-05 (Bankr. D. Conn. 2011). Generally, punitive damages are available only upon a finding that the debtor has shown actual damages. Malicki, 447 B.R. at 705. However, even without a showing of actual damages, punitive damages may be imposed for "an arrogant defiance of federal law . . ." Id.

Turning first to the question of whether Mr. Ladieu is due any actual damages, the Court focuses upon Mr. Ladieu's out-of-pocket expenses. The 2016(b) statement filed in connection with Mr. Ladieu's petition shows his attorney accepted $1,200.00 for his representation of Mr. Ladieu, with an additional $500.00 due if Mr. Ladieu requested a motion to redeem his automobile. Specifically excluded from the scope of representation are contested matters and adversary proceedings. At trial, Mr. Ladieu attempted to meet his burden of showing actual damages by discussing the steps he took and the charges he incurred in response to Rentrak's lawsuit against Galadieu. After learning of the pending lawsuit in Oregon, he visited his attorney. With the assistance of his attorney, he prepared a pro se answer to the Oregon lawsuit and incurred de minimis postage charges when he sent this document to the Oregon state court. Mr. Ladieu testified that he received a bill in connection with his attorney's work on the matter which

11

captured the work just described as well as research and drafting done in connection with this adversary proceeding. The invoice, dated June 20, 2011, was introduced at trial and, in total, the billed charges amounted to $1,474.00 for 7.37 hours of work.

On cross-examination, Mr. Ladieu testified that in late 2008, and prior to his deposition in this matter, he paid his attorney a retainer of $5,000.00. He also testified that he is on a payment plan, is making $100.00 per month payments, has not yet paid the June 20th invoice, and assumes that "whatever is left over" from the retainer will cover the June 20th invoice. The legal services his attorney rendered on behalf of Mr. Ladieu related to the violation of the stay issues is of the type typically done by attorneys in this district under their retainers in adversary proceedings. Furthermore, until the Court ruled that the Oregon Judgment was obtained in violation of the automatic stay, Mr. Ladieu had not raised the stay violation issue, choosing instead to dispute Rentrak's reliance on the judgment on collateral estoppel grounds. Consequently, the Court concludes that Mr. Ladieu failed to meet his burden of showing that he suffered actual damages from Rentrak's filing of a post-petition lawsuit against Galadieu.

In the absence of actual damages, punitive damages may be imposed only if the Court finds Rentrak's actions were undertaken with malice or in bad faith, or if they rose to the level of an arrogant defiance of federal law. To make this determination the Court considers the following factors: (1) the nature of the defendant's conduct; (2) the defendant's ability to pay; (3) the defendant's motives; (4) any provocation by the debtor; and, in some instances, (5) the defendant's level of sophistication. In re Crawford, 388 B.R. 506, 524-25 (Bankr. S.D.N.Y. 2008) (citations omitted).

Rentrak's actions were misguided and inadvisable; however, its conduct does not rise to a level that warrants imposition of punitive damages. Rentrak's representative testified that she instructed Rentrak's attorney in Oregon to pursue an action against Galadieu sometime between April and September 2008, after having reviewed certain bank records which raised some concern that Galadieu monies might still be recoverable out of Mr. Ladieu's wife's bank accounts. Rentrak's representative testified that she cautioned Rentrak's attorney at that time not to file suit against Mr. Ladieu personally specifically because he had filed bankruptcy and was protected by the automatic stay. Rentrak claims it felt it was able to pursue this course of action because the stay had not been extended to non-debtor guarantors under similar circumstances in chapter 7 cases in the Ninth Circuit. As noted in this Court's June 17 Order, this awareness of the automatic stay, and the awareness that case law is unsettled as to the extension of the automatic stay to non-debtor co-obligors or co-defendants should have raised a red flag for Rentrak to fully investigate the extension of the co-debtor stay in the district of the pending bankruptcy. Rentrak did not make any direct attempt to enforce its judgment against Mr. Ladieu personally other than seeking to rely upon the Oregon Judgment to establish the amount of damages due

under its claims in the instant proceeding. Vacating of the Oregon Judgment and admonishing Rentrak to more carefully and fully assess the scope of the automatic stay in future cases is a sufficient penalty for this conduct.

## CONCLUSION

For the reasons set forth above, the Court declares the Rentrak debt to be excepted from discharge pursuant to § 523(a)(6), and sets damages in the amount of $8,990.00; and denies Mr. Ladieu's counterclaim for actual and punitive damages based on Rentrak's violation of the automatic stay.

The Court has considered all of the arguments of the parties, and to the extent any argument is not specifically addressed herein it is because the Court has found it to be without merit.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

November 4, 2011  
Burlington, Vermont

Colleen A. Brown  
United States Bankruptcy Judge